Heath A. WILKINS, Appellant,

v.

STATE of Missouri, Respondent.

No. 71936.

Supreme Court of Missouri,
En Banc.

Jan. 9, 1991.

Rehearing Denied Feb. 7, 1991.

Sean D. O'Brien, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Appeal from the hearing court's denial of defendant's Rule 24.035 motion. We affirm.

Defendant was sentenced to death for the murder of Nancy Allen during the robbery of a convenience store in Avondale, Missouri. The conviction and sentence were affirmed in *State v. Wilkins*, 736 S.W.2d 409 (Mo. banc 1987), and reaffirmed in the United States Supreme Court. *Stan-*

*ford v. Kentucky*[1], 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). He now seeks postconviction relief presenting fourteen points of alleged error.

The operative facts of the crime may be found in 736 S.W.2d 409, 411–412, detailing Wilkins' vicious conduct which when coupled with other relevant evidence warranted the sentence of death. The record discloses that pursuant to a prearranged plan defendant and an accomplice murdered the helpless victim Nancy Allen. She was killed when seized by the accomplice and defendant

> thrust his knife into her back. Defendant said he was aiming at the kidneys, which he thought would be a fatal wound.
>
> Nancy Allen fell face down onto the floor. However, she rolled into a spread-eagled position with her back on the floor. Stevens [the accomplice] could not find everything that he wanted to take and could not operate the cash register. He asked defendant what to do. Nancy Allen replied, directing Stevens to what he sought but this caused defendant to stab his helpless victim three more times in her chest. Two of these pierced her heart. She continued to speak, begging for her life. Defendant silenced her with four stabs into the neck, one of which opened the carotid artery.
>
> As Nancy Allen's pierced heart oozed its life's blood into the opened cavities of her lungs and onto the floor, defendant and Stevens gathered up cash and merchandise and left the store. Defendant wiped fingerprints off the door handle before leaving. They stuffed the stolen items in the bag outside and left. Nancy Allen lay dying on the floor.

736 S.W.2d at 412.

On August 10, 1985, defendant, then 16 years of age, was arrested with his accomplices in Kansas City, about two weeks following the murder. He was taken to the police station where he was advised of his rights and in the presence of his mother

---

1. Defendant's case was consolidated with *Stanford v. Kentucky*, a case also involving a minor

sentenced to death.

and a juvenile officer was interrogated by a police officer. Defendant confessed his part in the crimes describing in detail the planning and execution of both the robbery and murder.

On August 12, Mr. Fred Duchardt of the Clay County Public Defender's Office was appointed defense counsel and on August 15, a certification hearing was conducted in the juvenile court to determine whether defendant should stand trial as an adult. The evidence included defendant's medical and juvenile records and pursuant to § 211.071, RSMo Supp.1984, the court certified that defendant could be tried as an adult.

On October 8, defendant was charged by information with first degree murder, armed criminal action and unlawful use of a weapon. Represented by Duchardt, defendant was arraigned in circuit court of Clay County on October 17 and entered a plea of not guilty or "not guilty by reason of mental disease or defect excluding responsibility" to all three charges. The circuit judge ordered a mental examination of defendant by the Western Missouri Mental Health Center which was conducted by a Dr. Steven Mandracchia on November 27. Mandracchia's reports containing the results of his examination were filed with the circuit court the following month and shortly thereafter defendant obtained an additional mental examination at his expense.

Sometime later, defendant confided to his attorney that he wished to withdraw his pleas of not guilty, enter pleas of guilty to all charges and seek the death sentence for the murder of Nancy Allen. Defendant's decision apparently grew from his realization that the evidence against him was overwhelming and it also appears he experienced some remorse for his acts. Most importantly his prior experience in various institutions convinced him that death would be preferable as he harbored a firm mindset against incarceration for the rest of his life.

In March of 1986, defendant was examined at his expense at the Menninger Foundation and the results of that examination became available in April. On April 16, a hearing was conducted before the Honorable Glennon McFarland in the Circuit Court of Clay County to determine defendant's competency at the time of the act as well as his competency to stand trial. The first witness, Dr. Mandracchia, stated unequivocally "there was no evidence of mental disease or defect as defined by Chapter 552 of the revised statutes of the state of Missouri" and that defendant was "competent to proceed." Dr. Mandracchia had examined defendant before learning that he reversed his position and intended to plead guilty and seek the death penalty. However, on being advised of defendant's changed intention, Mandracchia remained of the same opinion and testified, "I don't feel that he has any psychological or intellectual or cognitive limitations on his capabilities." The next witness, Dr. W.S. Logan, director of Law and Psychiatry at Menninger, who examined defendant in March, declined to state whether he felt defendant was competent to proceed to trial; rather, he testified defendant had average intelligence, understood the charges against him, the array of possible pleas open to him, the range of punishment, and could cooperate with his attorney. Logan, however, opined that defendant was proceeding under several errors of fact and was acting impulsively and had not thought through the consequences of his decisions. Though Logan testified that defendant suffered from some "emotional impairment where he would not be acting in necessarily his own best interests," he characterized "the execution of the crime as very purposeful, very deliberate, very well planned ... [with defendant making] numerous efforts to avoid detection, showing that he appreciated the wrongfulness of it ..."

At the close of the hearing, the court determined that defendant was competent to stand trial and at that point, Duchardt advised the court that defendant had asked him to withdraw as counsel and allow defendant to proceed pro se because Duchardt would not aid him in seeking the death penalty. The court questioned defendant as to his age, education, understanding of his right to counsel, and his motives for waiving counsel. The record is

replete with the court's and counsels' careful, complete and detailed appraisal of defendant's right to and the need for counsel, with discussions centering on his situation and the gravity of the crimes. Judge McFarland refusing to rule defendant's motion to waive counsel and proceed *pro se,* continued the cause allowing defendant further opportunity to reconsider.

On April 23, the hearings resumed and again the court conducted careful questioning of defendant and in a lengthy conversation with him emphasized his right to counsel and the benefits of such service. Defendant nevertheless executed written waivers of counsel, § 600.051, RSMo 1986, and the court again inquired at length making absolutely sure that defendant understood the range of punishment for each crime. Further he informed defendant that if at any time he wished the service of counsel he would be immediately accommodated and Mr. Duchardt was directed to remain in the courtroom to act in an advisory capacity if defendant had any questions or decided to allow Duchardt to once more represent him. Additionally, the court attempted to dissuade defendant informing him he felt the decision to plead guilty and seek the death penalty was a poor one; stressing repeatedly the seriousness of defendant's intended actions, the court emphasized that point by describing the horrors of dying by lethal gas. Defendant acknowledged the court's concerns, but stood fast in his decision and the cause was again continued, this time until May 9, with Judge McFarland urging defendant to reconsider and think "fully" about his decision.

On April 29, prior to the plea hearing, defendant was brought before the court and given the waiver and guilty plea forms for all three charges. Defendant resolutely repeated his announced intention to plead guilty and waive his right to trial by jury.

On May 9, the defendant again came before the court with Duchardt present in his role as "standby" counsel, and the court again encouraged defendant to accept Duchardt as his counsel, but to no avail. Judge McFarland warned defendant that if he pleaded guilty to first degree murder the court "very probably" would sentence him to death. Defendant acknowledged that he understood this and only then did the court conduct the requisite examination prefatory to acceptance of a guilty plea. In this examination, the Defendant stated he knew the range of pleas, punishments and rights to which he was entitled and asserted he had not been influenced by anyone else in his decision. Going further, he described the crimes and his part in their commission. The court accepted the pleas of guilty to all charges, including murder in the first degree; however, he informed defendant that should he change his mind and wish to withdraw his guilty pleas before the scheduled June 27 sentencing hearing, the court would consider such request. The court's last words to defendant at this hearing were that during the next month or so if he wished to be represented, the court would appoint an attorney for him. The defendant responded that he understood his rights.

At the June 27 sentencing hearing, defendant appeared with Duchardt present in the courtroom still in his advisory role. The court again recommended that defendant accept Duchardt's services as counsel but defendant declined and Judge McFarland assessed the maximum sentences for the lesser crimes. As to the first degree murder charge, the court first reiterated that defendant had the right to remain silent at this penalty phase of the trial, had a right to a jury at this stage and a right to counsel and encouraged him to reconsider. Defendant responded that he understood all this but wished to waive such rights. The court then offered defendant one last chance to withdraw his plea of guilty to first degree murder and again defendant declined informing the court he wished to proceed as previously stated.

Evidence was taken including defendant's incriminating statements given to the police on August 10, 1985, the testimony of the victim's husband, Robert Allen, several persons who had had contact with the defendant during his stays at various juvenile centers, and the testimony of Doc-

tors Mandracchia and Logan. Considerable portions of defendant's juvenile records offered by the State were kept out by the sustained objections of the defendant himself. Then defendant called and attempted to elicit testimony of Patrick Stevens, alleged by defendant as an accomplice in the robbery. However, Stevens asserted his Fifth Amendment right against self-incrimination and refused to answer defendant's questions. In his closing comments to the court, the defendant stated he wished the court to consider all the harm he had done and the fact that he preferred death as against imprisonment.

The court entered its order assessing the punishment at death for the murder of Nancy Allen. In determining that the death penalty was warranted, the court found the following aggravating circumstances: "Number One, the murder in the first degree was committed while the Defendant was engaged in the perpetration of the felony of robbery, and, Number Two, the murder in the first degree involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible, or inhuman."

Defendant took no steps to appeal his sentences, however this Court on its own motion directed the State Public Defender to enter the case as amicus curiae and brief all issues within the purview of this Court's reviewing power under § 565.035.1, RSMo 1986. On October 3, 1986, defendant and the attorneys for the amicus curiae appeared before this Court. At the conclusion of the arguments by the State and amicus curiae attorneys, defendant addressed the Court taking issue with several of the public defenders' comments, in which it was stated that defendant was incompetent at the time of the crime, at the time of the trial and at the hearings. Defendant stated he was competent at all times and made a rational decision to seek the death penalty for his crime.

This Court ordered that defendant be examined by Dr. Parwatikar of the Malcom Bliss Mental Health Center to determine if he was competent to waive his right to counsel on appeal. On December 31, Dr. Parwatikar's report was filed with this Court stating that defendant suffered from a mental disorder which made him incompetent "to waive his Constitutional Rights and represent himself in front of the [c]ourt." The report further stated that the defendant was competent to aid and cooperate with any attorney who may be appointed for him. On this information, appellate counsel was appointed, new briefs were submitted and new oral arguments heard.

Sometime after the decision of this Court in September 1987, affirming the conviction and sentence, defendant's position changed. On June 28th, 1988, defendant filed in circuit court his *pro se* Rule 24.035 motion seeking postconviction relief. This motion was amended first on August 28 and again on May 16, 1989, with the filing of a fifty-page motion. A hearing on the amended motions was conducted by Judge McFarland during the period May 22–26, and concluding on June 5, 1989, in which the defendant called five doctors who testified concerning his competence. The State presented two witnesses, Mr. Duchardt and Dr. Mandracchia. The transcript of this proceeding contains almost one thousand pages and more than 600 pages of exhibits and on July 26, the court denied defendant's motions. This appeal followed. Our review is limited to a determination of whether the hearing court's findings and conclusions are clearly erroneous. Rule 24.035(j).

■ The first of defendant's fourteen points is that Mr. Duchardt, while acting as his counsel in the juvenile certification proceedings, provided ineffective assistance by not requesting a mental evaluation. Procedurally, defendant is barred from raising the issue of his juvenile counsel's effectiveness. This Court in *Jefferson v. State,* 442 S.W.2d 6 (Mo.1969), held that a defendant who has been transferred from the jurisdiction of the juvenile court to a court of general law may attack the juvenile proceedings either by a motion in the circuit court requesting dismissal of the information or seeking a remand to the juvenile court for a proper hearing. *Id.* at 12. Fail-

ure so to do constitutes a complete waiver of any objection to the juvenile proceedings. *Id.*

In *State v. Abbott,* 654 S.W.2d 260 (Mo. App.1983), defendant on direct appeal challenged the effectiveness of counsel before the juvenile court in a § 211.071, RSMo 1978 proceeding, which resulted in defendant's certification for trial as an adult. Defendant charged that counsel had a "conflict of interest" which denied defendant full and adequate representation at the certification hearing but the court of appeals dismissed the point for defendant's failure to raise his objections to the juvenile proceedings before the trial court; such failure constituted a waiver of those complaints. This bar applies whether the defendant is seeking to raise the defects by direct appeal or in proceedings. *Richardson v. State,* 555 S.W.2d 83, 87 (Mo.1977).[2] Further, it applies to alleged constitutional claims, *Ford v. State,* 534 S.W.2d 111, 112–113 (Mo.App.1976), and to a minor defendant who waives objection to the juvenile court adjudication of suitability for prosecution by a subsequent voluntary plea of guilty in the criminal court. *Haliburton v. State,* 617 S.W.2d 417, 419 (Mo.App.1981).

■ Even if defendant's claim were preserved for consideration, it would be unavailing. After a guilty plea, counsel's effectiveness is only relevant in a motion for postconviction relief to the extent it affects the voluntariness of the movant's plea. *Troupe v. State,* 766 S.W.2d 722, 723 (Mo.App.1989). This requires that the defendant prove his counsel's performance was deficient and that prejudice resulted from the deficiency. *Sidebottom v. State,* 781 S.W.2d 791, 795 (Mo. banc 1989). Prejudice is shown by proof that but for counsel's unprofessional errors, there was a reasonable probability the result would have been different. *Id.* at 796.

■ Nothing in defendant's briefs or arguments discloses that counsel's alleged shortcomings before the juvenile court affected the voluntariness of his guilty plea.

Indeed, defendant not only pleaded guilty to first degree murder but actively sought the death sentence. He was not acting under some mistaken belief or misunderstanding caused by Duchardt's representation. Further, defendant's allegation that failure to request a mental examination by the juvenile court constituted ineffective assistance of counsel is meritless. We note that testimony from the Rule 24.035 hearing showed that the juvenile court had before it the complete documentation of defendant's previous institutionalization and various medical and psychiatric reports on the defendant. The juvenile court was, from its consideration of these reports and documents, aware of defendant's past mental problems. Failure to request a mental examination at this juncture cannot be said to indicate conduct rising to a level of ineffectiveness which subverted defendant's constitutional rights.

■ Defendant next asserts his conviction and sentence violates due process rights secured under the United States and Missouri constitutions and is violative of the Eighth Amendment's prohibition against cruel and unusual punishment in that he was "incompetent as a matter of law." On direct review counsel raised the issue of defendant's competency to stand trial and this Court rejected that challenge. *State v. Wilkins,* 736 S.W.2d at 415. Postconviction rule proceedings are not available as a vehicle to obtain a second appellate review of matters raised on direct appeal. *Arbeiter v. State,* 738 S.W.2d 515, 516 (Mo.App.1987). Accordingly, this contention is denied.

Defendant for his third point alleges that Duchardt rendered ineffective assistance of counsel during defendant's murder trial in that he called an adverse witness to testify against defendant; failed to cross-examine this adverse witness; failed to present contrary medical testimony as to defendant's mental state; abandoned defendant during the trial; failed to object to the court's finding that defendant was competent to

**2.** Although *Richardson* involved a Rule 27.26 proceeding, the procedural bar equally applies to motions under Rule 24.035.

proceed; and failed to investigate the law and facts pertaining to the defendant's competence to proceed *pro se.*

As previously noted, for a defendant to succeed on a claim of ineffective assistance of counsel, he must demonstrate that counsel's performance was both deficient and prejudicial. *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In this case involving a guilty plea, our review is to determine whether counsel's alleged deficiencies affected the voluntariness of the plea. *Troupe v. State,* 766 S.W.2d 722, 723 (Mo.App.1989).

The first instance of alleged ineffective assistance of counsel occurred when, during the competency hearing, Mandracchia testified that defendant was competent to proceed.

■ To address this issue we must reexamine the setting. At the arraignment, *Duchardt* entered a plea of not guilty and not guilty by reason of mental disease or defect on behalf of defendant. Voicing concern as to his client's competency to proceed, Duchardt requested that he be mentally examined. This motion was granted and defendant was examined by Dr. Mandracchia of the Western Missouri Mental Health Center. On receipt of Mandracchia's report, December 23, 1985, the defendant's counsel moved for an additional mental examination at defendant's expense. This too was granted and the additional examination was performed by Dr. Logan of the Menninger Foundation. At defendant's competency hearing, Duchardt called Mandracchia as his first witness who testified that in his opinion "there was no evidence of mental disease or defect as defined by Chapter 552 of the Revised Statutes of the State of Missouri" and that he felt that the Defendant had no "psychological, intellectual or cognitive limitations on his capabilities." On cross-examination, he stated the defendant was competent to plead guilty or not guilty to the crimes charged.

Defendant's claim of ineffective assistance fails to disclose any prejudice from counsel's action of calling Mandracchia. The examination of defendant and the subsequent hearing were held in accordance with § 552.020, RSMo Supp.1985. Under § 552.020.2, Mandracchia's report was filed with the trial court within sixty days following the order for the examination, and pursuant to § 552.020.5, copies were delivered to the defense and the prosecution. The purpose is to provide equal access to testimony establishing or refuting medical defense, *State v. Meeks,* 655 S.W.2d 536, 539 (Mo.App.1983), and this access is a matter of right. *State ex rel. Jordon v. Mehan,* 597 S.W.2d 724, 726 (Mo.App.1980). Mandracchia's oral testimony was consistent with his report which the parties had in hand and had defense counsel not called Mandracchia beyond question the prosecution would have produced him as a witness. The point is denied.

■ Defendant's second subpoint charges that Duchardt was ineffective for not cross-examining Mandracchia as to the objective basis for his testing of defendant. Some four years later in the Rule 24.035 hearing, motion counsel cross-examined Mandracchia on the basis of his testing of defendant and discovered that he was unaware or had forgotten several aspects of Defendant's background, including certain hallucinations as a child. However, defendant again has failed to establish prejudice. We note that Mandracchia's competency report lists all documents used as his sources of information on defendant and a review of those items reveals the doctor had employed the very documents which defendant now claims that he never read. At the Rule 24.035 hearing, held nearly four years after the report was made, Dr. Mandracchia understandably experienced some difficulty remembering all the documents he had used for the initial examination and it has not been shown that cross-examination of the sort defendant now urges would have been productive.

Mistakenly, defendant suggests *Miller v. State,* 498 S.W.2d 79 (Mo.App.1973), is controlling here. In *Miller,* the court of appeals decided that an attorney who believed his client incompetent to proceed to trial but failed in part to contest the report of the medical examiner and subject that ex-

aminer to cross-examination at a competency hearing, had rendered ineffective assistance of counsel. *Id.* at 87. However, two factors distinguish *Miller* from the case before us. There, counsel advised defendant to plead guilty and waive many of his constitutional rights; in contrast, Duchardt consistently counseled against defendant's wish to plead guilty and seek the death sentence. In *Miller*, counsel appears to have remained silent until the postconviction hearing as to his reservations concerning defendant's competency, while Mr. Duchardt argued from the first day that he felt defendant was incompetent to proceed and it was he who sought a second examination to refute the Mandracchia report. Counsel's service to defendant at the competency hearing did not fall below accepted norms.

■ Defendant next asserts that counsel was ineffective for not offering certain testimony of Dr. Logan that Defendant was incapable of proceeding without counsel. At the competency hearing Logan testified as to his diagnosis of defendant's mental health, but would not give a definitive statement concerning defendant's competence as defined in Chapter 552. However, at the postconviction motion hearing, Logan testified he found defendant definitively incompetent to proceed as his own counsel. Defendant now asserts this later piece of evidence should have been elicited. Again defendant fails to demonstrate a nexus between counsel's action and the voluntariness of his guilty plea. Duchardt devoted nearly four months attempting to turn defendant from the course he determined to take. Defendant himself advised the court that Mr. Duchardt informed him of available pleas, punishments and defenses, and had repeatedly attempted to dissuade him from his intended action. Mr. Duchardt as counsel[3] performed properly and defendant fails to state how his conduct either as active or "standby" counsel affected the voluntariness of defendant's

plea. This failure is fatal to the contention. *Troupe v. State,* 766 S.W.2d at 723.

Defendant's fourth subpoint alleges that Duchardt was ineffective for "abandoning" defendant during the trial. In effect, defendant insists that counsel should some how have forced his services upon defendant. We can but sympathize with Duchardt for the dilemma in which he found himself. Defendant for some months prior to trial had repeatedly stated he intended to plead guilty and seek the death penalty; he insisted that Duchardt aid him in that quest and not attempt to thwart his plan. Duchardt felt he could not aid defendant in this purpose and a conflict had arisen between attorney and client.

■ Defendant asserts that under the Rules of Professional Conduct, Duchardt had a duty not to "abandon" his client or at a minimum should have sought the appointment of a *guardian ad litem* to represent the defendant's interest after Duchardt was dismissed as counsel. Several flaws are readily apparent in these assertions. First, Duchardt did not "abandon" his client by moving to withdraw as counsel. As we read the record, it was defendant who by *pro se* motion sought Duchardt's removal, and it must be emphasized that if not satisfied defendant had a right to discharge his lawyer. *Allen v. Fewel,* 337 Mo. 955, 87 S.W.2d 142, 145 (banc 1935). Defendant could not have been forced to accept Duchardt's representation. *State v. Thomas,* 625 S.W.2d 115, 124 (Mo.1981).

Additionally, the term "abandon" connotes a complete withdrawal or walking away from the client without the client having a reasonable opportunity to obtain the service of other counsel. Such did not occur in this case. Even after defendant insisted he be dismissed Duchardt by direction of the court remained available to Defendant at every stage of the proceedings and was present in the courtroom throughout the trial. During interim periods, Duchardt was accessible to assist de-

3. As previously discussed, Duchardt was requested by the court to remain in the courtroom during all stages of defendant's trial and to be available for any questions that defendant may

have had and act as "standby" counsel should defendant change his mind and wish representation by counsel.

fendant with any legal question. Apparently defendant availed himself of this service by contacting Duchardt on several occasions and, in the penalty phase, defendant called upon Duchardt to speak on his behalf and to handle certain evidentiary objections that defendant wished to make. Mr. Duchardt's role is not without precedent and closely resembles the situation in *State v. Rollie,* 585 S.W.2d 78 (Mo.App. 1979), where the court held appointment of such a legal "assistant" was appropriate. *Id.* at 85.

Next, the Rules of Professional Conduct require that "a lawyer ... shall withdraw from the representation of a client if ... the lawyer is discharged." Rules 1.16(a)(3). Further, the Comments to this rule provide that in cases where the client is mentally incompetent, the attorney "should make special effort to help the client consider the consequences and, in an extreme case, may initiate proceedings for a conservatorship or similar protection of the client." Defendant conceded Duchardt withdrew at his insistence and the defendant's complaint in this regard is spurious. Further, it is noteworthy how readily current counsel for defendant with casual indifference to his own patent inconsistency, in one breath berates Duchardt for *abandoning* defendant and in the next chastises him for *not withdrawing.* As to the appointment of a guardian or its equivalent this suggestion ignores the fact that defendant was then within the aegis of the circuit court, his mental condition was at issue in an ongoing proceeding before that tribunal. The issue and defendant personally were subject to the jurisdiction of the court of general original jurisdiction and in that situation the "comment" to the rule had little relevance. Duchardt could not be expected to defiantly flout the circuit court proceeding and attempt to invoke the jurisdiction of the probate division or to somehow require the circuit judge to appoint a guardian. Neither the evidence nor the posture of the case accommodates such a notion. Further, Defendant was repeatedly advised by counsel and the court not to plead guilty and seek the death penalty. We must ask what effect could a guardian

have had upon defendant's resolve to plead guilty? In neither brief nor argument does defendant suggest an answer to that question.

For his fifth subpoint defendant alleges that counsel was ineffective for not objecting to the court's finding that the defendant was competent to proceed to trial. The chronology tells a tale belying this assertion. Duchardt represented defendant through the hearing and immediately on the heels of the ruling that defendant was competent to proceed, he advised the court of the hiatus between client and counsel. Defendant confirmed that he no longer wanted Duchardt to serve as his attorney and after much discussion and repeated suggestions by the court for defendant to reconsider, the court finally ruled that Duchardt was off the team and assigned to the role of "standby" counsel. The prerogative was no longer his to act as counsel and make objections or otherwise participate in those proceedings except at defendant's request. While it might be argued that defendant could have lodged an objection to the court ruling before he was removed, no prejudice resulted from his failure or inability so to do because the point was preserved and raised on appeal and the ruling of competence affirmed by this Court. The contention is denied.

Defendant's last subpoint alleges that Duchardt was ineffective for not investigating the law or facts pertaining to defendant's competence to proceed *pro se.* The record does not support the assertion that counsel did not research this area of the law and defendant has failed to meet the burden of proof. Rule 24.035(h). If this unsupported allegation were true, defendant has not shown how it might have affected the voluntariness of his guilty plea. *Troupe v. State,* 766 S.W.2d at 723. Defendant has failed prove that Duchardt rendered ineffective legal assistance violative of his constitutional rights.

Defendant next alleges that he was deprived of his Sixth and Fourteenth Amendment rights in that Defendant's waiver of counsel was not knowing, intelli-

gent, and voluntary. On direct appeal, appellate counsel asserted: "The trial court erred in finding appellant competent to proceed and in failing to make a separate finding as to appellant's competence to waive his constitutional right to counsel and to a jury trial," this because the evidence was "insufficient" and because "appellate's competence to waive constitutional rights was not an issue at the competency hearing ..." The point was ruled against defendant by the Court in the direct review and accordingly is barred from consideration in the Rule 24.035 proceeding. *Arbeiter v. State*, 738 S.W.2d 516. Even though defendant's point was ruled on direct review, defendant in this postconviction proceeding frames the issue in somewhat different language, tangentially asserting defendant was denied his right to counsel because his "waiver" was not "knowingly, voluntarily or intelligently made" for the reason that "appellant was mentally incompetent to proceed as his own counsel." The trial court entertained this current version of defendant's assertion as an issue not foreclosed by the direct review, and while he appears to have erred in so doing we are loathe to condemn his willingness to permit defendant the opportunity for further hearing on the competency issue and shall examine the record to determine if his findings were clearly erroneous.

■■■■ We are mindful that an effective waiver of counsel must be voluntarily, knowingly and intelligently executed, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), and the test depends "in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981). Here, defendant, possessed of a ninth grade education, was found to be of average intelligence and throughout demonstrated a credible level of competence in handling his case. In this connection a defendant need not have the skills and experience of a lawyer to competently and intelligently choose self-representation. *Faretta v. California*, 95 S.Ct. at 2541.

■■ In the postconviction hearing, defendant called a plethora of witnesses concerning his competency to waive counsel and proceed *pro se*. The State called Dr. Mandracchia who, as previously discussed, examined defendant and testified at trial to his competence to proceed. As hereinabove noted, Mandracchia had been apprised that defendant had decided to plead guilty and seek the death penalty but maintained he was nevertheless competent to proceed and concluded "I don't feel that he has any psychological or intellectual or cognitive limitations on his capabilities." But Mandracchia "surprised" the State in the postconviction hearing by joining with the other professional witnesses and stating defendant was not competent to waive his constitutional right to counsel and proceed *pro se*. The hearing court determined that the testimony of defendant's witnesses as well as Mandracchia was "unpersuasive" and it was the court's responsibility to determine the credibility of witnesses and weigh the evidence. *See Eddes v. State*, 776 S.W.2d 463, 465 (Mo.App.1989). The court may reject any witness' testimony though no contrary evidence is offered. *Id.*

The transcripts of the original and postconviction proceedings reveal an experienced trial judge who cautiously and carefully dealt with the issues presented. There was no rush to judgment, indeed the record is replete with his studied refusal to proceed from one step to the next until all questions were resolved in so far as possible and protective measures invoked to secure defendant's rights. In the protracted proceedings hereinbefore discussed, Judge McFarland perhaps more than any person was favorably positioned to understand defendant and evaluate the evidence. He had ample opportunity to observe defendant and learn the innermost reason for his decision to waive counsel. This observation and oral examination of defendant could not be ignored and was necessarily taken into account when assessing the competency of a defendant to waive counsel. *Edwards v. Arizona*, 101 S.Ct. at 1884.

Judge McFarland's repeated detailed explanation to defendant of his right to counsel, the advantages of accepting appointed counsel, the gravity of waiving counsel and the seriousness of the charges against defendant extended over a two-month period and throughout defendant resolutely stated his desire to waive appointed counsel, proceed *pro se*, and plead guilty.

Waiving counsel, defendant executed the waiver form in accordance with § 600.051, RSMo 1986, and before accepting the waiver the court again made sure defendant understood the range of punishment, the right to counsel, possible results from waiving counsel and defendant's right to a jury trial.

In addition, though defendant did not renounce his waiver of counsel, he manifested his cunning, availing himself of the services of "standby" counsel when it met his purpose. During the proceedings, defendant's competence was displayed and was not lost on the court whose many hours of counseling and conversation with defendant gave him special insight and understanding of the factual and legal issues. The point is denied.

■ The fifth claim of error is closely related to the previous point. Defendant asserts he was incompetent to plead guilty, waive trial by jury and waive investigation and presentation of mitigating evidence in the penalty phase of the proceedings. Again, we note the issue of competence to waive a jury trial was raised and ruled adversely on the direct appeal and is not a proper matter for postconviction relief, *Arbeiter v. State*, 738 S.W.2d at 516, and a guilty plea waives the right to a jury trial in the guilt phase. *Griffith v. Wyrick*, 527 F.2d 109, 112 (8th Cir.1975).

■ Defendant would have us separate competence to proceed from competence to enter a plea, when in law they are inseparable. *See Mikel v. State*, 550 S.W.2d 863, 869–870 (Mo.App.1977), and *Newbold v. State*, 492 S.W.2d 809, 818 (Mo.1973). A finding of competence to proceed to trial is tantamount to a finding that one is competent to enter a plea of guilty. *Id.* This is simply a further effort by defendant to

reargue the trial court's ruling of defendant's competence to proceed and accordingly is denied.

■ Similarly, defendant's assertion of incompetence to waive investigation and presentation of mitigating evidence during the penalty phase must fail. The finding that defendant was competent to proceed to trial carries the meaning that defendant is able "to assist in his own defense." § 552.020.1, RSMo 1986. A finding of competence to proceed *pro se* means that the defendant had competency to "call the shots" as to his defense, *State v. Howard*, 668 S.W.2d 191, 195 (Mo.App.1984), including the introduction of mitigating evidence. In this regard, the prosecution during the penalty stage offered defendant's juvenile records and medical reports, but defendant's objections to this evidence was sustained as he did not want his past "dredged up" again in court.

■ The sixth point on appeal is that defendant's confession to the police taken at the time of his arrest was taken in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution because defendant was incompetent to waive his *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights and Mr. Duchardt was ineffective for not seeking to suppress that statement. This point was raised only in defendant's third amended Rule 24.035 motion filed May 16, 1989, nearly twelve months after his initial *pro se* filing. Rule 24.035(f) provides a limitation for such filing of sixty days from the date of the appointment of postconviction counsel. Defendant properly filed his first amended motion August 24, 1988, but the third amended motion raising the *Miranda* objection was filed more than six months after the deadline. Defendant's untimely contention is waived. *Day v. State*, 770 S.W.2d 692, 696 (Mo. banc 1989), *cert. denied* — U.S. ——, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989).

■ Defendant's seventh point on appeal asserts his death sentence exceeds the maximum authorized by law and is violative of the Ex Post Facto Clause of the

United States and Missouri Constitutions. He argues the Missouri legislature did not intend to subject defendants as young as he to the death sentence, and by enlarging the scope of the statute this Court in effect created an ex post facto situation. The governing statutes on this matter do not bear out defendant's contention. Section 211.071, RSMo 1986, provides that any child between the ages of fourteen and seventeen who is alleged to have committed an offense which would be considered a felony if committed by an adult may after an appropriate hearing be "transferred [from the jurisdiction of the juvenile court] to the court of general jurisdiction and prosecuted under the general law." Under Section 565.020, RSMo 1986, the crime of murder in the first degree is a class A felony with a possible punishment of death. It defies credulity to assert that imposition of the death sentence in such cases was not intended. An ex post facto law is one which proscribes an act criminal not so proscribed when committed or one which enlarges the penalty after the violation. *State v. Davis,* 645 S.W.2d 160, 162 (Mo. App.1982). At the time of defendant's crime, the laws as previously noted provided that a person age fourteen years or older could be subjected to the general jurisdiction of a criminal court and a person tried for first degree murder could receive as punishment the death sentence.[4] The point is meritless.

Defendant next complains the trial court failed to weigh evidence in mitigation when assessing the death sentence as required by § 565.030.4(3), RSMo 1986. Here again, defendant would resurrect an issue decided adversely to him on direct review. *See State v. Wilkins,* 736 S.W.2d at 415. We note now, as we did then, the report filed by the trial judge states he considered three mitigating factors when assessing punishment against defendant: 1) the age of the defendant, 2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substan-

tially impaired, and 3) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. Not only is defendant's point procedurally flawed it misstates the facts.

The ninth point asserts that defendant's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution because defendant is a juvenile and a presumption should exist that sixteen-year-olds are not sufficiently culpable to be eligible for the death sentence. This point has not only been addressed by this Court but also by the United States Supreme Court and in each instance this contention has been rejected. *State v. Wilkins,* 736 S.W.2d 409 (Mo. banc 1987); *sub. nom. Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Defendant may not use the postconviction rules as a platform to relitigate issues decided on appeal. *Arbeiter v. State,* 738 S.W.2d at 516.

For his tenth point defendant argues that Missouri's death penalty scheme is unconstitutional in that the aggravating circumstance "depravity of mind" enumerated in § 565.032.2(7), RSMo 1986, is unconstitutionally vague. Defendant's point was raised not only on direct review and ruled against him, but when raised in a later case this Court again found that the "depravity of mind" element is constitutional as applied by Missouri courts. *State v. Griffin,* 756 S.W.2d 475, 489–490 (Mo. banc 1988), *cert. denied* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). The point is denied.

The eleventh point asserts the trial court heard inadmissible, incompetent and irrelevant evidence at the sentencing hearing in the form of a presentence investigation report, a victim impact statement and the testimony of Dr. Logan, all in violation of defendant's Sixth Amendment right to confront and cross-examine witnesses. This claim of trial court error

---

**4.** Section 565.020 has now been amended so that punishment for persons age fifteen and younger for the crime of first degree murder is life imprisonment only. § 565.020.2, RSMo Supp.1990.

available for consideration on direct appeal is not cognizable in a postconviction relief proceeding. *Bevly v. State,* 778 S.W.2d 297, 300 (Mo.App.1989). However we note that Defendant's position is closely analogous to that of defendant in *State v. McMillin,* 783 S.W.2d 82 (Mo. banc 1990), in which defendant complained of evidence introduced during his sentencing hearing consisted of a presentence investigation report, a "victim impact statement", various documents including records of defendant's disciplinary problems in high school. *Id.* at 96. This Court ruled that the admission of the presentence investigation report is admissible by reason of Rule 29.07(a) and the admission of the "victim impact statement" did not run afoul *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), in that it was the trial court not the jury which determined the facts and decided punishment. *Id.* Such is this case. The admission of the presentence investigation report was proper and no prejudice resulted from the introduction of the victim impact statement.

Defendant next argues the trial court erred by allowing in evidence the testimony of Dr. Logan, privileged under §§ 552.015, 211.321, and 552.015, RSMo 1986. During direct examination of Logan in the sentencing hearing, the trial court turned to defendant and inquired if he "waived any privilege that you [defendant] might have to not have this witness [Dr. Logan] testify." Defendant responded that he did. Defendant acknowledged he had waived the privilege. *See State v. Evans,* 802 S.W.2d 507 (Mo. banc 1991). Point denied.

Defendant's twelfth point alleges his sentence is unconstitutional in that the trial court permitted defendant, "a mentally ill juvenile offender", to terminate the investigation of his defense and waive his right to present mitigating evidence. This is merely a variant of defendant's fourth point on appeal. Having found defendant competent to waive counsel and proceed *pro se,* it follows that defendant was competent to "call the shots" as to his defense and decline to present any mitigating evidence he may or may not have had at the time.

*State v. Howard,* 668 S.W.2d 191, 195 (Mo. App.1984). Further, defendant's statement that "no mitigating evidence was received" by the trial court is simply not true. Defendant's age, his history of institutionalization, his mental history came in by way of the records and testimony defendant himself has relied upon for his assertion of his mental incompetence. Defendant goes on to state that "the judge as sentencer was not aware, and did not consider, all of the relevant evidence in mitigation that was available at the time or that would have been available through a reasonable investigation." Not only does the record prove false the assertion, but defendant fails to enumerate what this "relevant evidence" might be. By so failing no prejudice is shown and the point is denied.

The thirteenth point on appeal is simply a request that this Court reconsider its "proportionality review" of defendant's sentence. Though the point has been finally determined and is not appropriate to this proceeding, a review of cases since the affirmance in *State v. Wilkins,* 736 S.W.2d at 417, reveals no disproportionality.

█ Finally, defendant contends the Rule 24.035 hearing judge erred in not finding that defendant's constitutional rights were violated because Mr. Larry Harman participated in defendant's prosecution. His role was that of a co-prosecutor. Harman had represented defendant seven years earlier in a minor juvenile matter and as the State suggests, this point is procedurally barred from consideration as it appeared for the first time in defendant's second amended motion filed several months after the filing deadline had run. *See* Rule 24.035(f). The deadline for filing such motions is mandatory and cannot be extended by the trial court. *White v. State,* 779 S.W.2d 571, 572 (Mo. banc 1989); *Day v. State,* 770 S.W.2d 692, 696 (Mo. banc 1989). Defendant's point is denied.

Judgment affirmed.

ROBERTSON, HIGGINS, COVINGTON, BILLINGS and HOLSTEIN, JJ., concur.

BLACKMAR, C.J., dissents in separate opinion filed.

BLACKMAR, Chief Justice, dissenting.

I would reverse the judgment and remand the case for trial on the issue of punishment. The question of death versus life imprisonment has not been adversarially tried. Such a trial should be required in any case in which the state seeks to execute a person who was a juvenile at the time the offense was committed. I would allow the guilty plea to stand, but would leave the way open for reconsideration of the waiver of trial by jury. *Cf. State v. Bibb,* 702 S.W.2d 462 (Mo. banc 1985).

It is within our authority under Rule 24.035(a) to make such a holding. That rule reads in pertinent part as follows:

(a) A person convicted of a felony on a plea of guilty and delivered to the custody of the department of corrections who claims that the judgment of conviction or sentence imposed violate the constitution or laws of this state or the constitution of the United States, that the court imposing the sentence was without jurisdiction to do so, or that the sentence imposed was in excess of the maximum sentence authorized by law may seek relief in the sentencing court pursuant to the provisions of this Rule 24.035. This Rule 24.035 provides the exclusive procedure by which such person may seek relief in the sentencing court for the claims enumerated. The procedure before the trial court is governed by the Rules of Civil Procedure insofar as applicable.

Our authority is not foreclosed by any prior proceedings in this case. The defendant filed no notice of appeal, because he received the sentence that he then desired. The case came to us only because of our statutory responsibility to review all death sentences. We initially invited the public defender to file a brief amicus curiae, but then reconsidered and appointed the public defender as counsel. The public defender did not argue in support of the proposition I now advance. *See State v. Wilkins,* 736 S.W.2d 409, 414 (Mo. banc 1987).

The Supreme Court of the United States granted certiorari in *Wilkins v. Missouri,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), to consider a single point, as follows:

Whether the infliction of the death penalty on a child who was sixteen at the time of the crime constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the Constitution of the United States?

Its opinion dealt with only that point. It did not foreclose our consideration of any other points.

It cannot be successfully argued that the defendant "waived" the point by failure to appeal. The record shows clearly that he tried to waive any right to adversarial determination by discharging his counsel and urging the trial court to sentence him to death. Since I would not allow him to waive an adversarial hearing at the trial stage, I would not allow him to effect a waiver by failing to appeal. Since the absence of an adversarial determination is a flaw tainting the entire proceeding, it is appropriately considered in a Rule 24.035 motion.

I do not challenge the statement in the principal opinion as to the trial judge's painstaking efforts to make sure that the defendant understood the consequences of his actions. It is manifest that the defendant, as of that time, wanted to be sentenced to death. He repeated his desire, unequivocally and articulately, before this Court. But it was not his choice as to whether or not he would be sentenced to death. *Wilkins,* p. 422, fn. 14, Donnelly, J. dissenting. Sentencing is the responsibility of the jury or, if there is a valid waiver, of the trial judge.

Although the trial judge expressed a strong predilection toward a death sentence before he heard evidence of the punishment phase, I am confident that he exercised his customary thoroughness in evaluating the evidence and weighing the aggravating and mitigating circumstances. Nobody undertook to marshal the evidence which might support a life sentence, or to argue the reasons for leniency. As the

trial judge said in his findings, both the prosecutor and the defendant urged the death sentence. The court did not have the assistance of counsel in adducing the facts and arguments bearing on the death sentence.

I am not sure that a defendant's right to represent himself is absolute, and would question the ability of a person sixteen years old to understand the consequences of a decision not only to forego counsel, but to urge the death sentence affirmatively. But I will not argue that the waiver of counsel was invalid. I would hold that the court, when a juvenile affirmatively seeks the death penalty, should make use of the established procedure of appointing a guardian ad litem or amicus curiae to present evidence and argument against the death penalty. Only in this way can the court have the proper foundation for an informed decision.

Such a requirement would be consistent with decisions in other areas as well as with statutory policy. In *Strahler v. St. Luke's Hospital*, 706 S.W.2d 7 (Mo. banc 1986), we held that the legislature could not cause the statute of limitations to run against a minor. The opinion observed as follows:

> We think defendant's contention that plaintiff should not now be heard to complain because she was free to "initiate her own suit" plainly ignores the disabilities and limitations that childhood, familial relationships, and our legal system place upon a minor of tender years—who has little if any understanding of the complexities of our legal system ... Our society takes great pride in the fact that the law remains forever at the ready to "jealously guard" the rights of minors....

*Id.* at 10, 12.

I cannot understand how a person who could not settle a damage suit could be allowed to present an unchallenged argument in favor of his own execution.

Our legislature has decreed that a minor cannot make her own decision to have an abortion. Section 188.028, RSMo 1986. *See Webster v. Reproductive Health Ser-* *vices*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). Yet the principal opinion would allow the defendant to connive of destroying his own life.

In *Cruzan by Cruzan v. Harmon*, 760 S.W.2d 408 (Mo. banc 1988), this Court said:

> This State has expressed a strong policy favoring life. We believe that policy dictates that we err on the side of preserving life.

In writing as I do, I realize that the trial court found the defendant competent to stand trial. But it would be a mistake to assume that the issue is free from doubt. The defendant has a troubled psychological history, beginning when he was ten years old, *Wilkins*, p. 422, Donnelly, J., dissenting. Dr. Parwatikar, who examined the defendant at the request of this Court, said that he was "incompetent to waive his constitutional rights and represent himself in front of this Court." As a result, we appointed appellate counsel for him instead of relying on an amicus curiae. How could he then be competent to waive trial counsel? Dr. Logan, who testified in the trial court, expressed strong reservations about his ability to act in his own interest, and, at the postconviction hearing, said that the defendant was incapable of proceeding without counsel. Dr. Mandracchia, who testified in favor of competency, testified at the postconviction hearing that the defendant was not competent to waive his right to counsel and proceed *pro se*. Thus the state's own witnesses, when confronted with the realities of the defendant's choice, retreated from their prior positions. Their changed testimony should not simply be brushed aside as the basis that they were unpersuasive. We really should not hold the defendant to a choice made when he was probably incompetent, when the question is one of consenting to execution.

The defendant may be executed for the crime to which he has pleaded guilty. *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). But let the adversary process work. Let there be evidence and argument in favor of life imprisonment. There is no compelling reason

to hold the defendant to a decision to argue for his own death. The case is unique, and surely will not recur. What harm can there be in allowing a trial?

I would reverse for trial of the punishment phase.